NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOC, INC. T/A SUMMIT EXXON, et al. | : |
| Plaintiffs, | : Civil Case No. 08-5344 (FSH) |
| v. | : **OPINION** |
| EXXONMOBIL OIL CORPORATION, and EXXON MOBIL CORPORATION, | : Date: April 1, 2010 |
| Defendants. | : |

**HOCHBERG, District Judge**

This matter comes before the Court upon Defendant Exxon Mobil Oil Corporation's ("Exxon") Motion to Dismiss the Complaint filed by Plaintiffs JOC Inc. t/a Summit Exxon ("JOC") and Sung Eel Chang Auto, Inc. t/a Ashwood Exxon ("Ashwood") for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6). This Court has reviewed the motion after oral argument being held before the Court on June 5, 2009 pursuant to Fed. R. Civ. P. 78.[1]

**I.    Factual and Procedural Background**

---

[1] The parties in this case sought to defer a ruling on this motion because of a newly passed legislative enactment in New Jersey that applies to the sale of gas station franchises that was enacted on the day that the parties were in court for oral argument on this motion. In October 2009, after months of negotiation regarding the sale of the franchises at issue in this suit, the parties informed the Court that the settlement discussions had failed because Exxon could not move fast enough to execute a sale of these stations and the parties were no longer seeking a delay of the Court's ruling. On October 21, 2009, the Court ordered the parties to re-file this motion to conform to the oral argument held on June 5, 2009.

Plaintiffs are dealers who operate Exxon-branded gas station franchises in New Jersey. They purchase gasoline from Exxon under written contracts called "PMPA Agreements."[2] JOC has been a franchisee of Exxon since 1986. On or about September 26, 2006, JOC and Exxon renewed the Franchise Agreement governing their relationship for the period January 1, 2007 through December 31, 2009. Ashwood has been a franchisee of Exxon since 1996. On or about November 9, 2005, Ashwood and Exxon renewed the Franchise Agreement governing their relationship for the period January 1, 2007 through February 28, 2009.

Under each Plaintiff's PMPA Agreement with Exxon, Exxon exercises unilateral control over a number of key terms of the contractual relationship. For example, Exxon has the exclusive right to determine and change the wholesale gasoline price (the "dealer tank wagon" or "DTW" price) charged to Plaintiffs. Exxon also determines the quantities of gasoline that JOC and Ashwood are expected to purchase each year and the terms and conditions pursuant to which the gasoline is delivered. Both JOC and Ashwood lease their stations from Exxon, and Exxon exercises control over the terms of such leases.

With respect to DTW pricing, Exxon uses a "zone pricing" approach. Zone pricing is the practice of dividing stations into zones, and then adjusting wholesale prices in accordance with the prevailing rates of other stations in the zone. According to Plaintiffs, Exxon implements zone pricing with respect to all stations to which it supplies gasoline at DTW prices. Plaintiffs further allege that in its implementation of zone pricing, Exxon advised them that it reviews the

---

[2] "PMPA" refers to the federal Petroleum Marketing Practices Act, which governs aspects of contracts entered into by gasoline suppliers and gasoline retailers. Plaintiffs are not pursuing any claims under the Act itself. Plaintiffs refer to these agreements as Franchise Agreements. The terms will be used interchangeably herein.

prices being charged by non-Exxon branded stations in a given price zone, and then subtracts 14 cents per gallon from the prevailing price within that zone. They claim that Exxon expects Plaintiffs to operate on this 14-cent-margin, but that Exxon does not use the same margin in all price zones. Plaintiffs allege that Exxon's zone pricing has been implemented or applied in ways that have placed them at a financial disadvantage.[3]

Beyond selling gasoline to franchisees like JOC and Ashwood, Exxon sells and delivers gasoline to dealer-owned and operated stations. Exxon also sells gasoline to jobbers, who distribute gasoline to stations, some of which are owned and/or operated by the jobbers, on their own and who bear the related distribution costs. Jobbers are able to purchase gasoline at the "rack" price, which is lower than the DTW prices charged to franchisees. This lower price is meant to account for the jobbers' absorption of the costs of picking up and delivering gasoline.[4]

---

[3] Specifically, Plaintiffs challenge Exxon's use of different weighted average price margins in different zones because the ultimate price Exxon charges to stations in different price zones may be lower than that charged to JOC and Ashwood. Plaintiffs complain that Exxon has charged one independently owned and operated gas station nearby (although in a different zone) DTW prices that were as much as seven cents per gallon less than those charged to JOC and Ashwood. Plaintiffs also complain that the DTW prices they have paid have been almost the same (1 to 7 cents less), and even greater at times, than *retail* prices of other Exxon-branded stations in other locations. Plaintiffs claim that they "cannot compete with stations that are able to sell gasoline at retail for less than or within 7 cents of what JOC and Ashwood are paying to purchase gasoline."

[4] Plaintiffs' Complaint focuses primarily on one particular jobber, Kimber Petroleum ("Kimber"), which entered into a distribution agreement with Exxon in March 2002. Kimber supplies at least three Exxon stations located near the JOC and Ashwood stations. Plaintiffs allege that the difference between the prices charged to them and to Kimber is greater than the cost of delivery and that the Kimber stations, as a result, pay less money than Plaintiffs do for the same grade and quality of gasoline and are, therefore, able to sell the gasoline at lower prices. According to Plaintiff, the three nearby Kimber-supplied stations charge significantly lower retail prices than JOC or Ashwood.

Exxon also supplies gasoline through inter-company transfers to stations that are owned and operated by Exxon.

In addition to the sale of gasoline, both JOC and Ashwood offer automobile repair services through service bays at each station. Plaintiffs allege, however, that their bay services have suffered due to an increase in manufacturer or dealer-provided maintenance services. They complain that their service bays have not generated sufficient revenues to justify their continued operation. In apparent recognition of this trend, Exxon has itself converted the service stations at many of its locations into "On the Run" convenience stores. JOC and Ashwood allege that they have requested permission to convert their service bays into convenience stores but that those requests have been denied.

Plaintiffs allege that they are now unable to operate at a profit or remain economically viable under their current PMPA Agreements with Exxon. They claim that Exxon's "pricing practices ... over which [Exxon] has exclusive control, are preventing JOC and Ashwood from being able to charge competitive prices and from being profitable."[5] Furthermore, Plaintiffs allege that Exxon has engaged in a number of actions that demonstrate bad faith in response to their financial difficulties. At a meeting with Exxon representatives in August 2006, Plaintiffs requested permission to either convert their service bays into convenience stores or purchase their stations and become independent stations rather than franchisees. Both requests were

---

[5] Plaintiffs also allege that Exxon is well aware of their financial struggles, emphasizing that Exxon knows that neither Plaintiff is able to sell the Contract Volume of gasoline required each month and that because of other operating expenses that are also within Exxon's control, a 14-cent average weighted margin is insufficient to allow Plaintiffs to both cover operating expenses and generate a profit.

ultimately denied. Plaintiffs also allege that they applied for Rent Waivers in early 2007, but that their applications were unsuccessful.

In response to this situation, Plaintiffs filed a Complaint on September 18, 2008 in Union County Superior Court, which was removed to this Court on October 29, 2008. Plaintiffs initially asserted four claims against Exxon and Defendant Exxon Mobil Corporation: (1) breach of contract pursuant to N.J.S.A. 12A:2-305; (2) breach of the implied covenant of good faith and fair dealing; (3) breach of New Jersey's Unfair Motor Fuels Practices Act (the "UMFPA") as codified at N.J.S.A. 56:6-17, et seq.; and (4) conspiracy to discriminate against Plaintiffs in the prices charged for gasoline.

Defendant moved to dismiss the Complaint in its entirety on November 20, 2008, but the motion was stayed pending resolution of Plaintiffs' motion to remand this proceeding to state court. Plaintiffs notified the Court on December 29, 2008 that they withdrew their motion to remand and voluntarily dismissed their claims against Exxon Mobil Corporation. The Court dismissed all claims against Defendant Exxon Mobil Corporation on January 9, 2009. The Court now considers Defendant Exxon's motion with respect to the remaining counts of Plaintiffs' Complaint.

## II.      Standard of Review

To survive a Rule 12(b)(6) Motion to Dismiss, "factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true even if doubtful in fact." *Bell Atlantic Corp. v. Twombly*, 550 U.S 544, 555 (2007). Furthermore, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. (internal citations and quotations omitted). According to the Third Circuit, "stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest the required element.  This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (internal quotations omitted) (citing *Twombly*, 550 U.S. at 556).

Although a court does not need to credit a complaint's "bald assertions" or "legal conclusions," it must view all of the allegations in the complaint as well as all reasonable inferences that can be drawn therefrom in the light most favorable to the plaintiff.  *Morse v. Lower Merion Sch. Dist*., 132 F.3d 902, 906 (3d Cir. 1997) (citing *Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir. 1989)); *see also In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1429-30 (3d Cir. 1997).  The Supreme Court recently held that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563.

In evaluating a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court may consider only the Complaint, exhibits attached to the Complaint, matters of public record, and undisputedly authentic documents if the Plaintiff's claims are based on those documents. *Pension Guaranty Corp. v. White Consol. Indus*., 998 F.2d 1192, 1196 (3d Cir. 1992).

**III.     Analysis**

    **A.     Count 1: Breach of Contract**

Plaintiffs allege that Exxon breached its PMPA Agreements in violation of N.J.S.A. 12A:2-305. This provision, New Jersey's codification of section 2-305 of the Uniform Commercial Code (the "U.C.C."), establishes that in contracts containing open price terms, "[a] price to be fixed by the seller or by the buyer means a price for him to fix in good faith." N.J.S.A. 12A:2-305(2).[6] Plaintiffs allege that Exxon breached its obligations under this provision "because the DTW prices that JOC and Ashwood are charged by [Exxon] are unjustly discriminatory, set in bad faith, and set with the intention of impairing the ability of JOC and Ashwood to compete and/or perform profitably."

Defendant moves to dismiss this count on a number of grounds. Most clearly, Exxon argues that Plaintiffs' contract-based claims should be dismissed for failure to comply with the notice provisions of the New Jersey Commercial Code. N.J.S.A. 12A:2-607(3)(a) establishes that buyers, such as JOC and Ashwood, who have accepted tender of the goods being sold "must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Defendant argues that Plaintiffs seek to hold Defendant liable for a breach of the PMPA Agreements but have failed to allege that they gave notice of such claims at all, let alone within a reasonable time after gasoline deliveries were accepted.

---

[6] The comments to this provision further explain that it "rejects the uncommercial idea that an agreement that the seller may fix the price means that he may fix any price he may wish by the express qualification that the price so fixed must be fixed in good faith. Good faith includes observance of reasonable commercial standards of fair dealing in the trade if the party is a merchant. (Section 2-103). But in the normal case a 'posted price' or a future seller's or buyer's 'given price,' 'price in effect,' 'market price,' or the like satisfies the good faith requirement."

In response, Plaintiffs argue that the notice requirement is meant only to require a buyer to give notice to the seller where the goods delivered are non-conforming and does not apply to the instant contract claims, which are based upon a breach of good faith in setting an open price term. Moreover, Plaintiffs claim that the Complaint clearly alleges that notice was sufficiently provided by asserting that "[i]n early 2006 JOC and Ashwood reached out to [Exxon] and explained that due to the factors detailed in the preceding paragraphs [which includes the discriminatory DTW prices], they were unable to cover their operating expenses or achieve a profit."

The comments accompanying this provision explain that "the rule of requiring notification is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy." Furthermore, buyers enjoy a degree of flexibility with respect to the form of notice that must be given:

> The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer, as under the section covering statements of defects upon rejection (Section 2-605). Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy. The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.

N.J.S.A. 12A:2-607(3)(a), Comment 4.

Nevertheless, despite this flexibility and Plaintiffs's arguments to the contrary, providing notice pursuant to this regulation is a condition precedent to filing any suit for breach of contract under Article 2 of the U.C.C. or its state counterparts. *See Caparelli v. Rolling Greens, Inc.*, 39 N.J. 585, 593 (N.J. 1963) (observing that with the advent of the Uniform Sale of Goods Laws,

"notice became an 'absolute condition' of an action for breach of warranty" for the sale of chattel); *Buff v. Giglio*, 124 N.J. Super. 94, 97 (N.J. Super. A.D. 1973) (explaining that while rejection of the goods is not a prerequisite to an action by the buyer, notification to the seller is).

Furthermore, courts have previously applied the notice requirements in proceedings alleging a breach of the obligation to set open price terms in good faith. *See Autry Petroleum Co. v. BP Products North America, Inc.*, 2006 WL 1174443, *3 (M.D. Ga. 2006) Although the *Autry* Court ultimately concluded that plaintiffs there had sufficiently alleged compliance with Section 2-607, it also observed that notice was a precondition to the lawsuit, and that any complaint alleging a breach of Article 2 of the U.C.C. must include general averments to the effect that the condition had been satisfied. *See also Zourob Enters. Inc. v. ExxonMobil Corp.*, No. 03-307825-C2 (Cir. Ct. of Wayne Co., MI, Apr. 5, 2004).

Courts in this district have also previously held that Section 2-607 will bar suits alleging breach of contract if its requirements are not satisfied. The court in *In re: Ford Motor Co. Ignition Switch Products Liability Litigation* dismissed without prejudice the express warranty claims brought by a number of plaintiffs because "[n]owhere in the pleadings do any of these particular named plaintiffs claim to have given this required notice." 2001 WL 1266317, *14 (D.N.J. 1997). The *Ford* Court, however, afforded plaintiffs an opportunity to amend the complaint to plead the required notice.

This Court finds similar deficiencies in Plaintiffs' Complaint. Generalized allegations that Exxon knew that these stations were struggling financially do not suffice as an assertion that notice of a breach of contract had been given. Plaintiffs have not alleged in the Complaint that

they notified Exxon that they believed their PMPA Agreements had been breached as a result of the high prices or resulting financial difficulties.

Count 1 is dismissed without prejudice and with leave to amend the Complaint **by April 14, 2010** to plead that the required notice of breach of contract had been given to Exxon within a reasonable time after the breach was discovered.[7]

### B.     Count 2: Breach of the Covenant of Good Faith and Fair Dealing

Plaintiffs also claim that Defendant has breached the implied covenant of good faith and fair dealing by, among other actions: (1) setting DTW prices that make it difficult, if not impossible, for Plaintiffs to perform profitably; (2) setting Contract Volumes of gasoline sales that make it difficult, if not impossible, for Plaintiffs to perform profitably; (3) refusing to lower such prices; (4) refusing to allow Plaintiffs to convert their service bays into convenience stores or purchase their stations; and (5) refusing to grant JOC and Ashwood Rent Waivers. Plaintiffs further allege that Exxon's actions and inactions "demonstrate that [Exxon] is exercising its

---

[7] Based on the evidence presented in Plaintiffs' supplemental papers in response to this motion, the Court notes that, if those facts are pled as discussed in the papers, Plaintiffs has a strong argument that it has met the notice requirement in N.J.S.A. 12A:2-607(3)(a). Defendant has also moved to dismiss Count 1 on the grounds that Plaintiffs have neither alleged conduct constituting bad faith under Section 2-305 of the New Jersey Commercial Code nor identified an express contract term constraining any of the pricing decisions made by Exxon. Because the Court dismisses Count 1 for failure to allege satisfaction of the U.C.C.'s notice provision, these arguments need not be addressed at this time, but Plaintiffs' amended pleadings shall be required to address any deficiencies raised in this matter as well. Because of the substantial delays in this case caused by the request of the parties to engage in settlement discussions and because fact discovery is set to close on June 19, 2010 and no further extensions will be granted, any further challenge addressed to either the "notice" or "bad faith" allegations of the Complaint shall solely be made in a Motion for Summary Judgment.

discretionary authority arbitrarily, unreasonably, or capriciously, knowing that by doing so, it is rendering it ... impossible for plaintiffs to meet their operating expenses and perform profitably."[8]

Exxon argues that these claims must be dismissed because New Jersey Law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing. Although the New Jersey Commercial Code recognizes an implied duty of good faith and fair dealing in sales contracts, Exxon contends that this implied duty does not give rise to an independent cause of action.

In making these arguments, however, Exxon appears to ignore or misinterpret substantial case law to the contrary. Under New Jersey law, "every contract in New Jersey contains an implied covenant of good faith and fair dealing." *Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396 (1997). Moreover, "a party's performance under a contract may breach [the] implied covenant even though that performance does not violate a pertinent express term." *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 244 (N.J. 2001). Exxon concedes this point, but appears to argue that this principle is subsumed by the duty of good faith and fair dealing established by the U.C.C.

The New Jersey Supreme Court, however, has articulated a test for determining whether the implied covenant of good faith and fair dealing has been breached in very similar situations:

> [A] party exercising its right to use discretion in setting price under a contract breaches the duty of good faith and fair dealing if that party exercises its discretionary authority arbitrarily, unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits <u>under the contract</u>. Such risks clearly would be beyond the expectations of the parties at the formation of a contract when parties reasonably intend their business relationship to be mutually beneficial. They do not

---

[8] Compl. ¶ 81.

>    reasonably intend that one party would use the powers bestowed on it to destroy unilaterally the other's expectations without legitimate purpose.

*Wilson v. Amerada Hess Corp.*, 168 N.J. at 251 (emphasis added). In *Wilson*, the court specifically considered a claim, not for breach of the express terms of contract, but for breach of the implied covenant of good faith and fair dealing.[9] There, as here, the contract at issue was governed by the New Jersey Commercial Code. Courts have regularly allowed plaintiffs to pursue separate good faith and fair dealing claims in similar situations. *See Anil Enterprises v. Getty Petroleum Marketing, Inc.*, 2009 WL 467844 (D.N.J. 2009); *Akshayraj, Inc. v. Getty Petroleum Marketing, Inc.*, 2007 WL 708852 (D.N.J. 2007); *Bob's Shell, Inc. v. O'Connell Oil Associates, Inc.*, 2005 WL 2365324 (D.Mass. 2005). *See also Flagler Automotive, Inc. v. Exxon Mobil Corp.*, 582 F.Supp.2d 367 (E.D.N.Y. 2008) (separately analyzing a Section 1-203 Implied Duty of Good Faith claim and a Section 2-305 Express Duty of Good Faith Claim).

Plaintiffs here have specifically alleged that Defendant exercised its discretionary authority over DTW pricing, rental rates and other decisions arbitrarily, unreasonably, or capriciously. The terms "arbitrarily, unreasonably, or capriciously" connote bad faith. Plaintiffs have also alleged that Exxon knew that its DTW prices and other decisions prevented them from receiving the contractual rewards or benefits they reasonably expected. For the purposes of this

---

[9] Exxon's attempt to argue otherwise is somewhat disingenuous in that it relies primarily on a quotation taken out of context. The language Exxon has cited from *Wilson* relates more to "the appropriate force of the implied covenant of good faith and fair dealing in reviewing the actions of a contracting party expressly vested with unilateral discretionary authority over pricing" than it does to whether such a covenant is independently enforceable. *Wilson*, 773 A.2d at 245-46.

motion to dismiss, Plaintiffs have stated a claim for a breach of the implied covenant of good faith and fair dealing.[10]

Defendant is correct that this independent cause of action is actually a "contract" claim. It arises under contract law and is not a logical claim outside the framework of a contract between the parties.[11] However, because this claim arises under Article 1 of the U.C.C., not Article 2, the notice requirement that applied in Count 1 does not attach here and thus this claim stands.

### C. Count 3: Breach of New Jersey's Unfair Motor Fuels Practices Act

Finally, Plaintiffs allege that Exxon has breached the UMFPA by discriminating "directly and/or indirectly in the prices charged to JOC and Ashwood for the same grade and quality of gasoline as compared to that charged to independently owned and operated stations and Kimber Supplied Stations," with the intent to destroy or substantially lessen competition. In relevant part, the UMFPA prohibits distributors, refiners, wholesalers and suppliers from discriminating "either directly or indirectly, in tank wagon price between different retail dealers purchasing the

---

[10] As one court recently observed, "the caselaw requires that Plaintiffs make a showing of bad motive, but it does not require that a claim must be summarily dismissed for its failure to include the words 'bad motive.'" *Akshayraj,* 2007 WL 708852 at *8. Furthermore, the *Wilson* court specifically acknowledged that a plaintiff must be given a full opportunity to show a defendant's bad motive. *See Wilson*, 168 N.J. at 252-54.

[11] *See, e.g., Wilson*, 168 N.J. at 251, as quoted *supra* at page 11; *Adams v. G.J. Creel and Sons, Inc.*, 320 S.C. 274, 277-79 (1985) (separate claims for breach of contract because of implied covenant of good faith and fair dealing and because of violation of Section 2-305). While Defendant notes that the official comment to the U.C.C. includes a statement regarding separate and independent claims, this section is not incorporated into the comment to the New Jersey codification of the U.C.C. In addition, the statement in the official comment, on its face, does not appear to prohibit this separate and independent claim from being brought as a breach of contract claim for violation of the implied covenant of good faith and fair dealing that is present in every contract, rather than for a breach of the express terms of the contract.

same grade, quality or quantity of branded motor fuel, except to meet competition," if such discrimination is conducted with intent to injure competitors or destroy or substantially lessen competition. N.J.S.A. 56:6-22(c).

Defendant argues that this claim must be dismissed because the Act does not prevent Exxon from charging different prices to direct-supply dealers like Plaintiffs, who pay the DTW price, and jobbers like Kimber, who pay the rack price. Plaintiffs respond that the Act's reference to "indirect" discrimination "encompasses secondary-line claims of discrimination, i.e., such as discrimination between prices charged to Kimber and prices charged to plaintiffs." Plaintiff's Complaint alleges that "the price difference between that charged to Kimber and that charged to JOC and Ashwood for the same ... grade and quality of gasoline is, upon information and belief, greater than the cost of delivery. That means that the Kimber stations pay less money than JOC and Ashwood for the same grade and quality of gasoline..." Thus, Plaintiffs do allege in the Complaint, although certainly not as clearly as they alleged during oral argument, that the disparity in price between what the jobber was charged and what Plaintiffs were charged was more than the normal course of business would dictate, and was therefore motivated by a discriminatory motive.

Defendant also argues that, even if this Court finds allegations of price discrimination between Plaintiffs and the "independently owned and operated stations" referenced in general terms in the Complaint, this claim must be dismissed because Plaintiffs have failed to plead any facts that tend to establish either that differential pricing was implemented with the intent to destroy or substantially lessen competition or that it was implemented for purposes other than to

meet competition.  The Complaint, as written, states that Exxon "acted with the intent to destroy or substantially lessen competition."

Plaintiffs, in response, argue that Exxon was aware that it offered different prices to different sellers and that it controlled Plaintiffs' operating costs, and was, thereby, allegedly responsible for their financial problems.  This, Plaintiffs argue, can support an inference that Exxon acted with the intent to destroy or lessen competition.[12]

The allegations that are made in the Complaint, as written, do not rise to the level of supporting an inference that Exxon was implementing its policies in a discriminatory manner. Plaintiffs have not alleged in the Complaint facts beyond a speculative level that tend to establish that Exxon established the zone pricing system, or any form of differential pricing, with the intent to restrain competition.  As a result, Plaintiffs have not stated a claim under the UMFPA; Count 3 is dismissed without prejudice and with leave to amend the Complaint **by April 14, 2010** to plead with greater clarity that Exxon implemented its zone pricing and other policies in a way that was designed to discriminate and with the intent to restrain competition.[13]

**IV.     Conclusion**

---

[12] At oral argument, Plaintiffs also argued that the manner in which Exxon has implemented zone pricing has prevented them from setting competitive retail prices.

[13] Counsel for Plaintiffs, at oral argument, asserted that Plaintiffs were attempting to make the allegation that Exxon was in fact "gerrymandering" its price zones, such that similarly situated retailers two miles away were being charged up to 30 cents less per unit of gas, in order to discriminate against these two stations and drive them out of business.  See Tr. of Oral Argument June 4, 2009 at 77:17 - 80:21.  If so pled in an amended complaint, the Court would be inclined to permit this count to proceed, subject to renewed challenge upon a Motion for Summary Judgment.

For the reasons given above, the Court grants Defendant's Motion to Dismiss in part and denies Defendant's Motion to Dismiss in part.  An appropriate Order will issue.


                        **/s/ Faith S. Hochberg**
                        Hon. Faith S. Hochberg, U.S.D.J.